(No. 10626.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN J. HALPIN, Plaintiff in Error.

*Opinion filed December 21, 1916—Rehearing denied Feb. 7, 1917.*

1. CRIMINAL LAW—*acts of conspirators in accomplishment of their purpose are admissible although the indictment against a co-conspirator is for receiving a bribe.* Evidence showing the crimes committed and the acts and declarations of conspirators in the accomplishment of the purpose of the conspiracy, if in furtherance of the common design, is admissible although the indictment against a co-conspirator is for receiving a bribe, which is charged to be the result of the conspiracy.

2. SAME—*when the acts of conspirators are admissible although subsequent to receiving the bribe charged in the indictment.* On the trial of a police officer charged with receiving a bribe as the result of a conspiracy to enable part of the conspirators to practice the confidence game without molestation, where the object of the conspiracy is not accomplished by the giving of the bribe but is a continuing one, it is not error to admit evidence of crimes and of acts and declarations of the conspirators during and in pursuance of the conspiracy and subsequent to the receiving of the bribe.

3. SAME—*acts of conspirators during absence of co-conspirators are admissible against the latter.* The acts and declarations of conspirators in the absence of their co-conspirators are admissible in evidence against the latter on the same principle as are the acts and admissions of agents when offered in evidence against their principals.

4. SAME—*acts of conspirators after the termination of the conspiracy are not admissible against co-conspirator.* While the acts of one conspirator during the existence of a conspiracy are competent evidence against his co-conspirators, no act or declaration before the beginning of the conspiracy or after its termination can be admitted in evidence on the separate trial of a co-conspirator charged with receiving a bribe as a result of the conspiracy.

5. SAME—*patrol sheets of a municipal detective bureau are admissible, when authenticated, against officer charged with receiving a bribe.* Patrol sheets of the daily transactions of a municipal detective bureau, required by a municipal regulation to be kept in the office of the commanding officer of the bureau, are public records when properly authenticated, and are admissible in evidence, without proof of the truth of their contents, against the chief offi-

cer of the bureau who is on trial for bribery, and the question of their weight as evidence is for the jury.

6. SAME—*matter of impeaching a witness on cross-examination rests largely in discretion of trial court.* The cross-examination of a witness as to his occupation, associations and conduct, and other things immaterial to the issue, for the purpose of determining his credibility, is a matter to a great extent in the discretion of the trial court and does not constitute error unless the discretion is abused, but it is not proper to ask the witness as to his guilt of particular crimes.

7. SAME—*when an instruction to consider fact that witness has testified to escape imprisonment should be given.* An instruction telling the jury that if they believe, from the evidence, that any witness has testified in expectation of escaping a term of imprisonment for the commission of a crime they may take such fact into consideration in determining the credibility of such witness, should be given if particularly applicable to one witness, even though another instruction is given with regard to the testimony of witnesses who had been promised the assistance of the State's attorney in an application for a pardon.

8. SAME—*when a letter written in furtherance of conspiracy is admissible.* On the trial of the chief of a municipal detective bureau for accepting a bribe as part of a conspiracy to give police protection to a certain class of criminals, letters sent out from the detective bureau by a co-conspirator in furtherance of the conspiracy are admissible against the chief, regardless of whether he had knowledge of their being sent.

9. SAME—*when judgment will not be reversed although there is error.* Errors in the admission of evidence and in instructing the jury which are not of a prejudicial character will not justify a reversal of a judgment of conviction, if the jury, acting reasonably on the competent evidence and under proper instructions, could have reached no other conclusion.

CARTER, J., specially concurring.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JESSE A. BALDWIN, Judge, presiding.

JOHN E. NORTHUP, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, FRANK JOHNSTON, JR., and W. W. DEARMOND, for the People.

Mr. Justice Dunn delivered the opinion of the court:

The plaintiff in error was convicted of bribery in the criminal court of Cook county and has sued out a writ of error to reverse the judgment. The errors assigned and argued relate to the admission of evidence and the refusal of instructions.

The single count of the indictment, after setting out certain sections of an ordinance of the city of Chicago establishing the police department and providing for its organization, charged that the plaintiff in error was on January 7, 1913, a captain of police assigned to duty as chief of detectives of the city of Chicago, and that then, and for a long time prior to that date, Christian P. Bertsche, Frank Ryan, James Ryan, John Strosnider, and other persons whose names were unknown, were engaged in the commission of crimes known as the confidence game and had committed such crimes in the city of Chicago, and were about to commit, and did commit, other such crimes in that city; that they had before that time obtained from William T. Kirby $20,000 by means of the confidence game, and were about to, and did, obtain by means of the confidence game, money, checks and drafts of the value of $15,500 from Hope L. McEldowney, and like property of the value of $11,000 from Mary E. Rapp, and large amounts of property from other persons whose names were unknown. It is further charged that on January 7, 1913, the plaintiff in error unlawfully, corruptly and knowingly did accept and receive from Christian P. Bertsche the sum of $500 as a bribe, present and reward for the purpose of influencing the plaintiff in error in the performance of his duties as a member of the police force and causing him to execute such duties with partiality and favor, and to permit the said Bertsche, James Ryan, Frank Ryan, and other persons unknown, to commit the crime of confidence game in the city of Chicago without molestation and without being arrested,

and to permit them to avoid arrest in the city of Chicago
for the offense of confidence game, and with the intent to
induce and persuade and cause the plaintiff in error to re-
frain from arresting or causing to be arrested said Bertsche,
Ryan and others for the commission of the offense of con-
fidence game committed by them before that time and to
be thereafter committed in the city of Chicago, and to keep
and protect them, and each of them, from arrest and pun-
ishment and free, clear and exempt from police molestation,
interference or attack while engaged in the commission of
the crime of confidence game and other crimes in the city
of Chicago.

Evidence was introduced tending to show that during
the time from June, 1911, until March, 1913, James Ryan
and Frank Ryan, who are named in the indictment, and
other persons under various names, at different times were
engaged, under the guise of clairvoyants, in operating the
confidence game in the city of Chicago; that during that
time they swindled their victims out of large amounts of
money in sums ranging from $50 to $20,000, Frank Ryan's
enterprises having brought him the sum of $75,000, though
that amount also included his receipts from the business of
fortune telling, which he operated in connection with his
clairvoyancy. Bertsche was not a clairvoyant, but he or-
ganized a combination by virtue of which the clairvoyants
and fortune tellers, wire-tappers and other criminals who
operated under his authority, in consideration of payments
of money were to be permitted to commit these classes of
crimes in the city of Chicago without molestation by the
police. Bertsche acted as the representative of the combi-
nation in the transaction of its business with the plaintiff
in error. He received from the criminals themselves the
money which was paid for the purpose of securing the ac-
quiescence of the police and paid over monthly to the plain-
tiff in error the sums agreed upon with him. He notified
the plaintiff in error when and where "book-stores," as the

places were called where the operations were conducted, were to be opened and who were to conduct them. In March, 1912, two policemen, O'Brien and Carmody, were at Bertsche's suggestion detailed by the plaintiff in error specially on clairvoyants instead of the two policemen who had previously had that assignment. Thereafter all papers to be served and all complaints and investigations in regard to clairvoyants were turned over to these officers, and Bertsche paid to O'Brien $400 a month,—$200 for himself and $200 for the plaintiff in error. Numerous crimes were committed and complaints by victims of the conspiracy were made at different times, but were delayed, hindered and suppressed and no action was taken on them. On January 4, 1913, the place of Frank Ryan in which he was operating as a clairvoyant was raided by two policemen not on the clairvoyant detail,—Egan and Dempsey. Ryan was warned by his doorman before the admission of the officers and left the house by the back door until after their visit. McCabe, a clairvoyant who assisted Ryan, Strauss, a man in his employ, and a visitor who had called to have his fortune told, were arrested and taken to the police station, held for about an hour and a quarter and discharged without any charge being made against them. Egan, one of the officers, searched the place and took away with him a book which Ryan called his "red-book" and which Bertsche in his testimony called the "sucker book," used to keep the names of people who were swindled and certain personal data in regard to them and the amounts of money received from them. Through Bertsche and O'Brien the book was returned to Ryan on the same day and Egan was paid $500 for it. Frank Ryan complained to Bertsche about the raid, saying that he was satisfied it was a frame-up, that O'Brien was in it, and that he wanted to have a better assurance than that of O'Brien and Bertsche against the recurrence of the raid. Bertsche told Ryan that he would have the plaintiff in error assure him everything was all right, and

two or three days later the plaintiff in error, with Bertsche, visited Ryan in his place in the evening. Ryan was a fugitive from justice from Boston and from New York, and shortly before this had been compelled by a lawyer and a detective from New York to pay $2900 on account of a forfeited bail bond, and he was concerned about this as well as Egan's raid. Both of these occurrences were mentioned, and the plaintiff in error said that the New York affair could not be avoided but in future Ryan should go right along,—nothing would happen to him. Bertsche then gave to the plaintiff in error $500 and said, "Here is a present from the boys," and the plaintiff in error said, "All right." This is the transaction which was charged in the indictment and was the basis of the prosecution.

It was clearly shown that clairvoyants were engaged in conducting their business and in connection with it operating confidence games in the city of Chicago during the time in question, that many people were victimized and that complaints made to the police produced no results. The direct testimony tending to connect the plaintiff in error directly with the conspiracy for the operation of confidence games without molestation by the police was given by Bertsche and others of the conspirators, whose testimony, if believed, was sufficient to establish the guilt of the plaintiff in error.

Bertsche testified that in June, 1911, he went to the office of the plaintiff in error, with whom he had not been previously personally acquainted though he had met him and knew him by sight, and told him that he wanted to open up Harry Waite in a book-store and that Waite could afford to give up $100 a month for the plaintiff in error. The plaintiff in error said that he heard they made a lot of money down east, and Bertsche answered yes; that Waite was one of that gang. Plaintiff in error then asked where he was going to open up, and Bertsche told him he was going to open up on Michigan avenue, and thereupon paid the plaintiff in error $100. He also told him that he had

some "pay-off" men who wanted to open up, and in the
event they made any money he would take care of plaintiff
in error on a ten per cent basis.   By pay-off men he said
he meant "wire-tappers, who skin a man on the wire,—give
him a phoney horse and beat him on it."   After that Waite
started in business and subsequently the Ryan brothers and
others under Bertsche's authorization, and the wire-tapping
business was also conducted by still others, and Bertsche
paid to the plaintiff in error, from time to time, the $100
a month which had been agreed upon and which was in-
creased from time to time, and also the commissions on the
wire-tapping swindles.   These sums were usually paid in the
Lamb's cafe, where the plaintiff in error went for lunch and
for dinner and where Bertsche met him.   These payments
continued from June, 1911, until after the payment of the
$500 charged in the indictment, the last money, as testified
by Bertsche, being $100 sent by mail in a special delivery
letter to plaintiff in error at Hot Springs in March, 1913.

In January, 1913, Mrs. Hope L. McEldowney, in re-
sponse to an advertisement of James Ryan, came to his
place to have her fortune told.   In the next two months
Ryan succeeded in getting $15,500 from her, a part of
which was a draft for $12,500, which was turned over to
Bertsche, who collected it.   On February 24, 1913, Frank
Ryan got a draft for $7489.50 from Mrs. Mary E. Rapp,
making, with other money, $11,000 which he had taken
from her.   Early in March the Ryans left Chicago not in-
tending to return, because they were no longer able to pre-
vent the many people whom they had swindled from carry-
ing their complaints to the police.   They went to Kansas
City with the intention of going into the clairvoyant busi-
ness there, and James Ryan did not return until he was
brought back from Wyoming on April 18, 1913, as a re-
sult of extradition proceedings.   Frank Ryan was absent
from Chicago, except two or three days, until October, 1914,
when he gave himself up to the officers.   Various indict-

276 – 24

ments were found against both the Ryans and Bertsche in connection with their swindling operations. Bertsche and James Ryan were indicted for obtaining the $15,500 from Mrs. McEldowney, were tried in November, 1913, and were convicted. They sued out a writ of error in this court, the judgment was affirmed and a petition for a rehearing was denied in December, 1914. Through the connivance and misfeasance of the officers charged with the enforcement of the law and the execution of this sentence, Bertsche, although in custody, was not committed to the penitentiary under this sentence until July 6, 1915, when he was imprisoned one day and then was permitted to leave the penitentiary and was not confined there more than two or three days before the trial of this case, in December, 1915.

Direct testimony as to the specific charge on which the indictment was based,—the payment of $500 on January 7, 1913,—was given by Bertsche and the Ryans. It occupies but trifling space in the record, the greater portion of which is taken up with the testimony of witnesses, records and other documentary evidence showing the existence of a conspiracy on the part of Bertsche and his associates and certain police officers to permit the former to carry on their criminal schemes without interference by the police, and showing the crimes committed and the acts and declarations of the conspirators in the accomplishment of the purpose of the conspiracy. This evidence was competent, though the indictment was for receiving a bribe and not for conspiracy. If the crime charged was the result of a conspiracy, then the acts and declarations of the conspirators were admissible in evidence the same as if the indictment were for the conspiracy. The object of the conspiracy was not accomplished merely by the giving and acceptance of the bribe on January 7, as alleged in the indictment. It continued as long as the commission of crimes by the one set of conspirators continued without interference by the other set. It was therefore not error to admit evidence of the com-

mission of other crimes, and the acts and declarations of the conspirators in connection with them during the continuance of the conspiracy, subsequent to the giving of the bribe which was the substantive charge in the indictment.

On the trial of the present case Bertsche and Ryan were permitted, over the objection of the plaintiff in error, to tell a conversation which took place just before their trial for obtaining the property of Mrs. McEldowney by means of the confidence game, between them and policeman O'Brien, in regard to the list of jurors drawn to try the case, the substance of which was that O'Brien knew one of the jurors and would manage to handle him through the juror's brother-in-law, and that he would speak to the captain (the plaintiff in error) about another juror who lived around Halpin's street and have Halpin see what he could do with him.  Testimony was also admitted, over the plaintiff in error's objection, of a conversation between Bertsche and James Ryan in the summer of 1913, when the latter was in jail awaiting trial on the McEldowney indictment, in which Bertsche told Ryan that plaintiff in error was trying to get bail for him.  Plaintiff in error was not present at these conversations and knew nothing about them, but it is insisted that they were admissible as the acts of co-conspirators in furtherance of the object of the conspiracy. On the other hand it is insisted that this evidence was improperly admitted because the conversations occurred long after the conspiracy had terminated.  Evidence of the acts and declarations of conspirators in the absence of their co-conspirators is admitted against the latter on the theory "that by the act of conspiring together the conspirators have jointly assumed to themselves, as a body, the attribute of individuality so far as regards the prosecution of the common design, thus rendering whatever is done or said by anyone in furtherance of that design a part of the *res gestæ* and therefore the act of all.  It is the same principle of identity with each other that governs in regard to the acts

and admissions of agents when offered in evidence against their principals and of partners as against the partnership." (3 Greenleaf on Evidence, sec. 94.) While the acts and deeds of a co-conspirator during the existence of a conspiracy are competent evidence against his co-conspirator, no act or declaration before the beginning of the conspiracy or after its termination can be admitted in evidence on the separate trial of a co-conspirator. The conspiracy in question had for its object, as charged in the indictment, to permit the persons mentioned to escape arrest for the crimes of confidence game which they had committed or should commit, and "to keep and protect them, and each of them, from arrest and punishment, and free, clear and exempt from police molestation, interference or attack while engaging in the commission of the crimes of confidence games and other crimes in the said city of Chicago, county of Cook and State aforesaid." The conspiracy thus charged terminated, according to the very language of the indictment, when the conspirators ceased to engage in the commission of crimes in the city of Chicago. The protection from arrest and punishment, the freedom from police molestation and exemption from interference, were to be extended only during the time the conspirators were engaged in committing crimes. When they abandoned Chicago as a field of criminal exploitation the conspiracy had accomplished its purpose. They had enjoyed the freedom of the city for the commission of crimes without molestation or interference and the city's police had been enriched by the fruits of the crimes committed. Nothing more remained to be accomplished or was contemplated. Even if the People were not bound by the allegations of the indictment, there is nothing in the evidence which indicates any further purpose in the conspiracy. It was a commercial transaction for the commission of crime. Bertsche, as the captain of a horde of pillagers, desired to plunder the people of Chicago, and he made a bargain with the city's guardians not to interfere

while the plundering continued. The objects of conspiracies are not ordinarily set down in writing and usually few words spoken can be proved expressly describing their purposes. Such is the case here. All that appears is that Bertsche said he wanted to open up Harry Waite in a bookstore and that he would give up $100 a month to the plaintiff in error; that the plaintiff in error said, "Go ahead," and Bertsche paid him $100. Nothing more was said then or later, but the monthly payments continued and were largely increased as business improved and new lines were added. This certainly did not mean that absolute protection was to be furnished the criminals from all kinds of prosecutions for all time. The city was farmed out for exploitation by the month. The payments were by the month or on a commission basis, and there can be no doubt that there was no expectation of protection after the payments ceased. This occurred in March, 1913. The conspirators then ceased to engage in crimes in the city of Chicago and abandoned the city permanently, as they hoped. The object of the conspiracy had been accomplished and the conspiracy was terminated. Since the evidence of what was said and done by the other conspirators competent against the plaintiff in error is limited to their acts and declarations made and done while the conspiracy was pending, it was error to admit the evidence under consideration.

O'Brien was tried before the police trial board in the fall of 1913 upon charges preferred against him, and Bertsche testified that while the trial was going on he talked with plaintiff in error in the Lamb's cafe and said to him, "I see old Doc Russell is standing up for Walter," and also spoke about the "little nigger" going against Walter, (meaning by "little nigger" Frank Ryan's bell-boy, Gillege.) He does not say that the plaintiff in error made any response. James Ryan testified that soon after his conviction on the McEldowney indictment he told the plaintiff in error he wanted to go out and "open up a store—a clairvoyant's office," and

asked him if he could give Ryan a letter to Louisville. The plaintiff in error refused, saying that he gave one fellow a letter and that got him in a little trouble and he did not want at this time to send anybody else down there. O'Brien's statement called for no remark from the plaintiff in error and Ryan's conversation with him had no relation to the case. Neither of these items of evidence was competent and they should not have been admitted.

Doc Russell, a clairvoyant who had operated under Bertsche and gone away, returned without Bertsche's knowledge and opened up a clairvoyant establishment. When Bertsche learned of it he went to the place with some associates, made an assault upon Russell, cut his hair in the shape of a cross by running clippers back and forth across his head, robbed him of his jewelry and threatened to kill him if he did not leave town. Evidence of this occurrence was admitted over objection. The People also introduced evidence tending to show that O'Brien tried to induce the Ryans to deal with him and pay the money to him directly instead of through Bertsche. There is no evidence that the plaintiff in error knew anything about these transactions, and they were not competent as the acts of co-conspirators because they did not tend in any manner to accomplish the purpose of the conspiracy. The acts and declarations of co-conspirators are only admissible when they are done or made in furtherance of the purposes of the conspiracy and in carrying out the common design. "It is undoubtedly the law that after a conspiracy is established only those declarations of each member which are in furtherance of the common design can be introduced in evidence against the other members. Declarations that are merely narrative as to what has been done or will be done are incompetent and should not be admitted, except as against the defendant making them or in whose presence they are made." (*Spies* v. *People,* 122 Ill. 1, p. 237.) It was error to admit this evidence.

In connection with the raid on Frank Ryan's place on January 4, Bertsche and Ryan testified that they had an interview with policeman Walter O'Brien on that same day, immediately after the occurrence, and accused him "of being in the job and shaking them down," but he denied it and said that Egan acted for himself and wanted $500 for the red-book. The testimony of a number of witnesses was introduced to show that O'Brien was not on duty on January 4; that in the forenoon he was in a dentist's office, where he was having dental work done, for an hour and a half or an hour and three-quarters after 8:15; that at twelve o'clock he left Chicago with his wife and went to Grand Rapids, Michigan, where he arrived at five o'clock and remained until five o'clock the next evening, when he returned to Chicago, arriving at nine o'clock. To rebut this evidence the State introduced certain documents known as "patrol sheets." Dan O'Hara, a policeman, testified to a conversation with the plaintiff in error at the detective bureau in regard to the case of one Howard, known as the "Brass Kid," on January 30 or 31, 1913. The plaintiff in error testified that on both of those days he was at home ill, and he was corroborated by other evidence in this particular. To rebut this evidence similar patrol sheets were introduced as in the case of O'Brien. These patrol sheets purported to show the attendance and absence of all officers and employees at the detective bureau for the twenty-four hours ending at eight o'clock A. M., one set for each day. The record shows that under the municipal code, regulations of the department were promulgated requiring records to be kept in the office of the commanding officer of the bureau, in which should be entered, daily, all the transactions of the detective force in detail, including the assignment and work performed daily by each member of the bureau for the various services performed according to an established rule, and that there should also be kept a record book of credit due the members of the bureau. The patrol

sheets were kept in pursuance of this regulation and were public records admissible in evidence upon being properly authenticated, without evidence as to the truth of their contents. The question of their weight as evidence was for the consideration of the jury. They were competent and the objection to them was properly overruled.

Bertsche testified that in July, 1913, he asked the plaintiff in error to help him secure a bond for James Ryan and the plaintiff in error sent him to see a man by the name of Skidmore in regard to it. Skidmore was called as a witness by plaintiff in error, and testified that Bertsche came to see him about the bond and did not mention the plaintiff in error and that the plaintiff in error never mentioned the subject to Skidmore. On cross-examination, over the objection of the plaintiff in error, numerous questions were asked and answered by the witness in regard to the class of trade he had had in saloons which he had conducted, allowing women in them, running rooms for assignation purposes in connection with his saloon, and collecting money from women running houses of prostitution and paying it to the police. The cross-examination of a witness as to his occupation, associations and conduct, and as to other things immaterial to the issue, for the purpose of determining his credibility, is a matter to a great extent in the discretion of the court and does not constitute error unless the discretion is abused. It was not proper to ask the witness, on cross-examination, as to his guilt of particular crimes, for the purpose of affecting his credibility. It would not have been proper to show his conviction even if he had been convicted of such crimes.

Included in the documentary evidence introduced by the People were certain letters and telegrams received at and sent from the detective bureau. Among them were letters passing between the detective bureau and the chief inspector of police in Boston in regard to Frank Ryan. The first of these bore the signature of plaintiff in error as captain of

detectives, was addressed to the chief inspector of police at Boston, and inquired in regard to any records the inspector might have of Prof. Redfern, *alias* Frank Ryan. The answer to this, signed by the chief inspector and addressed to the plaintiff in error, stated that there was an indictment warrant for James D. Redfern for a larceny of $3000 by means of bogus mining stock, and stated that Redfern was also known as Frank P. Ryan and John Holly; that he was arrested in New York for the police department of Boston in May, 1911, and gave bail but forfeited it in the sum of $10,000. The letter requested information if the plaintiff in error had him under arrest or could get him, and stated that officers would be sent to bring him back to Boston. The reply to this letter, bearing the signature of the plaintiff in error, stated that the officers were on the lookout for him and if found would arrest him and notify the inspector at Boston, saying also, "He is *not* the Frank Ryan concerning whom I wrote you on December 24." The evidence showed that the private secretary of the plaintiff in error in general opened the mail and wrote the outgoing letters, signing the plaintiff in error's name, and only in special cases was correspondence submitted to the personal inspection of the plaintiff in error. Frank Ryan had asked policeman O'Brien to find out for him whether the police in Boston were wanting him, and there is evidence from which it might be inferred that the correspondence which has just been referred to was conducted by O'Brien through the office of the plaintiff in error. The plaintiff in error requested the court to give the following instructions:

"The court instructs the jury that if they believe, from the evidence in this case, that the defendant, John J. Halpin, was not informed and had no knowledge of the contents of the several letters and documents on file in the detective bureau and offered in evidence in this case, then in that event the jury should entirely disregard said documents and letters in evidence in arriving at a verdict."

"If you believe, from the evidence in this case, that communications were received at the detective bureau and placed on file while the defendant was chief of detectives, which communications might have informed him of the presence in Chicago of the witness Frank Ryan, *alias* Robert L. Milton, or of his identity and of his criminal operations, yet unless it has been proved from the testimony in this case that such communications came to the defendant's attention and knowledge or that he knew the contents thereof he is not chargeable with knowledge of the same, and in the event that you so believe you should entirely disregard such communications in arriving at a verdict, even though you may further believe that it was his duty to inform himself as to the nature and purport of the various records on file in the office."

The court refused to give these instructions but of his own motion gave the following instruction:

"The jury are instructed that under the evidence in this case it will be for you to determine whether the defendant, Halpin, knew of the matters involved in the correspondence, or any of it, referred to in the evidence, and he is not to be held chargeable for such as you may find, from the evidence, he knew nothing about."

The instructions requested by the plaintiff in error were properly refused. The effect of the correspondence which has been set out, and its purpose, was to aid in carrying out the object of the conspiracy by protecting Frank Ryan from arrest, and even though the plaintiff in error had no personal knowledge of the correspondence, yet if it was conducted by O'Brien, one of the conspirators, the effect was the same as if done by the plaintiff in error. The evidence was admissible against him, and he was bound by it to the same extent as if the letters had been written and received by himself. The instruction given by the court of its own motion was more favorable to the plaintiff in error than he was entitled to, because it stated that he was not

chargeable for such of the correspondence as he knew noth-
ing about, when, in fact, he was chargeable with such as
was conducted by a co-conspirator in furtherance of the
conspiracy, whether he knew anything about it or not.

The court refused the following instruction asked by
the plaintiff in error:

"If you believe, from the evidence in this case, that any
of the witnesses who have testified here have done so in
the hope or expectation that they will thereby be able to
escape a term of imprisonment for the commission of a
crime, you may take that fact into account, together with
all the other evidence in this case bearing upon the credi-
bility of such witnesses, if any there be, in determining the
weight and credit to which their testimony may be entitled."

The counsel for the defendant in error say that this in-
struction was properly refused because the same benefit was
given to the plaintiff in error by another instruction, which
stated that if the jury believed, from the evidence, that any
witness who had testified as an accomplice had been prom-
ised the aid and assistance of the State's attorney in an
application for a pardon, that fact might be considered by
the jury in determining the credibility of the witness. The
promise of assistance in an application for a pardon was
different from a hope or expectation of escaping a term of
imprisonment in the penitentiary by other means. The in-
struction was intended to cause the jury to consider an-
other kind of expectation. It is argued that the instruction
was inaccurate and confusing because there were no wit-
nesses in the case who were in such a position that they
might hope or expect to escape a term of imprisonment for
the crime. Bertsche was the most important witness for
the People. At the time of the trial he had already escaped
one year of a term of imprisonment in the penitentiary for
the commission of a crime of which he had been convicted
and in which the judgment of conviction had been affirmed
by the Supreme Court, and his testimony shows that he un-

derstood that the mandate from the Supreme Court had been held up by somebody in the State's attorney's office with whom he said he may have had a conversation about it; that he did not expect to be in the penitentiary at all, and that he was testifying under the hope and expectation that Hoyne would get him out. It thus appears that he expected to escape a term of imprisonment in the penitentiary, and that his experience in escaping one year of that term already, regardless of the law and the judgments of the courts and the duty of the officers charged with their execution, justified that expectation.

Error against the plaintiff in error occurred on the trial. Was it of such a character as to require a reversal of the judgment? The plaintiff in error was denied none of his constitutional or statutory rights. The errors were errors of procedure, in the admission of evidence and instructing the jury. If the correction of the errors might reasonably be expected to result in a different verdict this judgment should be reversed. On the other hand, if the jury, acting reasonably on the competent evidence, under proper instructions, could have reached no other conclusion than that of guilt the judgment ought not to be reversed so that a better record may be made on another trial. The acts done after the termination of the alleged conspiracy and those done not in carrying out the purposes of the conspiracy were incompetent, but without considering them the evidence leaves no doubt of the existence of a conspiracy for a year prior to March, 1913, whereby the Ryans and others were permitted openly to conduct clairvoyant parlors for the purpose of operating confidence games and that many people were swindled out of their money for large amounts in the aggregate by means of the confidence game, by the connivance and under the protection of the police. Complaints made to the police and brought to the attention of the plaintiff in error through the mayor and the chief of police, as well as by individuals, produced no effect. Other

members of the police force knew of this condition, and it cannot be supposed that the chief of detectives, with all this information in his files, was the only one on the force in ignorance of the facts. Frank Ryan was actively protected from arrest by misinformation given to the police force in Boston. It is true that the evidence of Bertsche and the Ryans comes through crooked channels from a corrupt source, and the testimony of the actual payment of the $500 bribe comes from them, alone. An item of evidence corroborating their story of Halpin's connection with the conspiracy as condemnatory as anything in the case is that in regard to the receipt of $100 by Halpin at Hot Springs, Arkansas, in March, 1913. Bertsche and James Ryan testified that Bertsche inclosed a hundred-dollar bill, with a short note, in a special delivery letter mailed to Halpin at Hot Springs early in March, 1913. The delivery of a special delivery letter to him there was proved, and Halpin admitted receiving such a letter containing $100 but said that it was from one Corbett. Corbett was not called as a witness and no explanation of his absence was made. This must have seemed extraordinary to the jury and justified them in believing that the chief of detectives was receiving money from the chief of the clairvoyants. It seems to us that no other conclusion can be reached.

While the special instruction as to the credibility of the witnesses which has been discussed should have been given, the attention of the jury was called to this subject by the instruction which was given, and though the latter instruction did not completely cover the case, it did caution the jury as to the credibility of witnesses testifying under hope of favor from the State's attorney. Under the circumstances the judgment should not be reversed for the refusal of this instruction.

The evidence, even considering the corrupt origin of much of it, carries with it an abiding conviction of the plaintiff in error's guilt, and the jury, acting on such evi-

dence as was legally competent, under proper instructions, could have reached no other conclusion.

The judgment will be affirmed.  *Judgment affirmed.*

Mr. JUSTICE CARTER, specially concurring: I concur in the conclusion reached in this opinion but not in all that is said therein.