(No. 10461.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. WALTER O'BRIEN, Plaintiff in Error.

*Opinion filed February 21, 1917.*

1. CRIMINAL LAW—*conversations between conspirators after the conspiracy is ended not competent.* Conversations between conspirators after the conspiracy is ended are not competent against conspirators not present, but the admission thereof in evidence on the trial of the latter for receiving a bribe as part of a conspiracy to secure police protection for certain criminals is not necessarily ground for reversal.

2. SAME—*when judgment of conviction will not be reversed on the evidence.* A judgment of conviction in a criminal case will not be reversed on the ground that it is not supported by the evidence, where the evidence in the record is such that the jury could not reasonably have returned a verdict other than that of guilty.

3. SAME—*record need not be free from error in order to sustain conviction.* A defendant charged with crime should be accorded all the rights which the law entitles him to, and errors denying him substantial rights require a reversal of a judgment of conviction; but it is not essential in order to sustain a conviction, where the evidence of guilt is clear, that the record be free from all error.

4. Other questions herein involved are discussed at length and decided in *People* v. *Halpin,* 276 Ill. 363.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN M. O'CONNOR, Judge, presiding.

JOHN E. NORTHUP, (FREDERIC BURNHAM, of counsel,) for plaintiff in error.

P. J. LUCEY, Attorney General, and MACLAY HOYNE, State's Attorney, (FRANK JOHNSTON, JR., W. W. DEARMOND, and GEORGE C. BLISS, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Walter O'Brien and William Egan, members of the police force of the city of Chicago, were indicted at the August, 1915, term of the criminal court of Cook county for the crime of receiving a bribe of $500 from Christian P.

277 — 20

Bertsche on January 4, 1913. They were jointly tried and convicted of said crime, and pending the motion for a new trial Egan died. His death was suggested of record, the motion for a new trial as to O'Brien overruled, and a judgment rendered on the verdict of the jury sentencing him to the penitentiary. He has sued out this writ of error to reverse that judgment.

The indictment, of one count, is substantially in the form of the indictment in *People* v. *Halpin,* 276 Ill. 363. Like the indictment in the *Halpin case* it alleges that Christian P. Bertsche, Frank Ryan, James Ryan, Jacob Straus, Edward McCabe and divers other persons whose names are to the grand jurors unknown, were committing, had committed and were about to commit divers crimes in the city of Chicago known as the confidence game, and had obtained and were about to obtain large sums of money from persons named, and from divers other persons to the grand jurors unknown, by means and by use of the confidence game. The indictment alleges that for the purpose of influencing them in the performance of their duties to enforce the laws and ordinances throughout the city of Chicago against persons who had committed or were about to commit crimes in said city, in arresting such parties and holding them to answer charges or until discharged by law, and for the purpose of influencing them to perform their duties with partiality with reference to arresting or causing to be arrested said Bertsche, the Ryans, McCabe, Straus and divers other persons and holding them in custody to answer such charges as might be preferred against them or until discharged by law, said Egan and O'Brien did on January 4, 1913, take, accept and receive from said Christian P. Bertsche the sum of $500 as a present and reward, given with the intent of influencing them in the discharge of the powers and duties vested in them, and to induce them to permit and authorize said Bertsche, the Ryans, Straus, McCabe and others to commit in said city the crime of con-

fidence game without molestation and without being arrested, and to permit the said McCabe, Straus and Ed R. Hellstern, then under arrest and in the legal custody of Egan, to unlawfully escape, and to induce said Egan and O'Brien not to complain against, prosecute or appear as witnesses against said Straus, McCabe. or Hellstern, and to refrain from arresting or causing to be arrested Bertsche, the Ryans, McCabe, Straus and divers others persons for the commission of the confidence game, and to protect said persons and keep them free, clear and exempt from police molestation, interference or attack while engaging in the commission of said crimes.

According to the testimony introduced by the State, about June or July, 1911, Bertsche made arrangements with Capt. Halpin, of the detective bureau, to put Harry Waite in business as a clairvoyant. He was to pay Halpin $100 a month for protection for Waite. Later Frank Ryan was also permitted to go into the same business with Waite. Waite and Ryan arranged to pay Bertsche $400 a month for protection, and Bertsche paid Halpin $200 a month. Subsequently others, through Bertsche's arrangement with the detective bureau, were permitted to go into the same business. In March, 1912, Halpin assigned O'Brien and Carmody, who were detectives under him, on clairvoyants. O'Brien conferred with Bertsche, and Bertsche promised to pay him $100 per month, and, if things went along all right, to raise the pay. These payments were made for several months, and after James Ryan, a brother of Frank, had opened up a clairvoyant parlor the payments were raised to $200 a month.

We deem it unnecessary to a decision of this case to set out in detail the evidence of the dealings of O'Brien with Bertsche and the clairvoyants in protecting them from arrest and prosecution while engaged in their criminal occupation, but, coming on down to the specific charge in the indictment of receiving a bribe of $500 January 4, 1913, it

appears that on that day, between eleven and twelve o'clock in the forenoon, William Egan and John Dempsey, detectives from the bureau under Halpin, went to the place on Michigan avenue where Frank Ryan was operating under the name of Robert L. Milton. They rang the bell, and the door boy, Jesse Gillige, colored, notified Ryan that officers were at the door. Ryan escaped the back way and went to a saloon on Fourteenth street, where he telephoned Bertsche and O'Brien. The door boy let the officers in. They found there McCabe and Straus, also a man named Hellstern, who was receiving a reading. The officers arrested all three of these men. Egan found in a closet a book which Ryan called his "red book," and took it with him. The officers had no warrant for the arrest of any of the parties but took them to the Harrison street station and locked them up but no charge was placed against them. Bertsche, who had been notified by Frank Ryan of the arrest of the men, intercepted them on the way to the station and inquired of the officers if they were not out of their latitude. Dempsey told him to talk to "Big Bill," meaning Egan. Bertsche notified Halpin that Egan had arrested some of his men. O'Brien was also notified by Frank Ryan of the arrest and went to the saloon on Fourteenth street where Frank Ryan was, to see him. O'Brien asked Ryan if the red book was worth $500 to him, and said Egan was a hard man to deal with. Ryan told O'Brien to see Bertsche, and O'Brien left. Frank Ryan also notified his brother, James, of the trouble, and he also came to the saloon where Frank was. They remained there about one and one-half hour, when Bertsche called them, told them everything had been arranged, and asked them to come to his (Bertsche's) saloon. Bertsche also saw O'Brien at his (Bertsche's) saloon and complained of the way Frank Ryan's place had been treated. O'Brien said he did not know anything about it until Frank called him up. Bertsche told O'Brien that Egan had the red book. O'Brien said, "You know Bill; he wants the dough; he

wants $500." Bertsche replied he would have to see Ryan about that. O'Brien asked Bertsche to give him $500 to give Egan for the red book, but Bertsche told him to send Egan over himself, and O'Brien then left. When the two Ryans arrived at Bertsche's saloon he informed them that the men arrested had been released. In a few minutes Egan came to Bertsche's saloon and they all went into a back room, where Bertsche paid him $500 and he returned the red book. Bertsche then said, "Now, for Christ's sake, lay off these fellows and leave those places alone." Egan said all right—he would not bother them any more. The red book contained the names and addresses of a number of persons Ryan had obtained money from, and some of the entries in it were in code form. Frank Ryan testified when O'Brien met him at the saloon on Fourteenth street, after the raid, he asked O'Brien "what was the idea of the officers breaking into our store;" that O'Brien replied, "Well, Frank, you know Egan; he is always butting in where he don't belong, and no doubt he felt he could get a piece of change there; that is why he went there." Ryan said, "They have taken my red book, with a list of my clients, which was very valuable." O'Brien said he so understood, and Ryan said he wanted his book back. O'Brien then said, "Yes, but he won't give it back unless he gets $500; is it worth $500 to you?"

The objection that the court erred in admitting evidence of other offenses than the one specifically charged in the indictment is answered contrary to the contention of plaintiff in error in *People* v. *Halpin, supra.* Certain conversations were proved by the State, mostly occurring after the conspiracy had ended, which were not competent and should not have been admitted, but they were not of a character to require a reversal of the judgment. The evidence as to the conspiracy between the police officers, clairvoyants and Bertsche (the latter the go-between for the clairvoyants and police officers) was very similar in this case to that in the

*Halpin case.* Bertsche and the Ryans were the most important witnesses, but there were sufficient corroborative facts and circumstances to justify the belief that the corrupt arrangement they testified to existed and that in the main they were telling the truth. At all events, it was for the jury to determine the weight and credit to be given to their testimony. That the jury believed it is indicated by their verdict of guilty, and we are not at liberty to say they were not justified in believing it. In fact, it seems to us impossible, from a careful reading of all the testimony, which is much too voluminous to set out even in substance, that any other rational conclusion can be reached than that the transactions between the police officers and the clairvoyants occurred as testified to by the witnesses.

It is insisted the evidence fails to show plaintiff in error received a bribe in connection with the transaction on January 4, 1913; that the proof shows the money was paid to Egan, and that if O'Brien was guilty of any crime in connection with that transaction it was in obtaining the bribe to be given to Egan. We have above set out briefly the testimony relating to that transaction. O'Brien told Frank Ryan at the saloon on Fourteenth street (before, so far as the record shows, he had seen Egan after the arrest,) that Egan wanted $500 before he would give up the red book. He told Bertsche in the latter's saloon that Egan would have to have $500, and he wanted to take the money to him. Bertsche declined to give him the money, whereupon O'Brien left, and in a short time Egan came in, received the money and gave up the book. This proof warranted the inference that O'Brien was in on the deal. The bribe was given and received as a part of the general scheme for protection by the police of the clairvoyants named, as alleged in the indictment.

Plaintiff in error offered proof to show that he was not in Chicago the afternoon of January 4, 1913; that he left the city between twelve and one o'clock with his wife and

went to Grand Rapids, Michigan, where he arrived at five o'clock in the evening and remained until five o'clock the next evening, when he left for Chicago. To rebut this proof the State offered "patrol sheets" and the testimony of those in charge of them. The same testimony was offered on the same subject in the *Halpin case,* where it was held the patrol sheets were competent evidence and their weight was for the consideration of the jury.

Complaint is made of the giving of ten instructions on behalf of the People. We shall not extend this opinion by setting them out. Instructions 3, 4, 8 and 9 are objected to as abstract propositions of law. They are substantially statements of propositions of law, and two of them possibly had little bearing upon the case. They could not, however, have prejudicially affected the rights of the defendants. Instruction 7 is awkwardly worded but could not have misled the jury. It related to the purpose in offering evidence of other crimes, and told the jury that the defendants were on trial for the specific charge of one offense,—in accepting and receiving $500 on January 4, 1913,—and were to be found either guilty or not guilty of that charge, alone; that the evidence of other offenses was for the purpose of showing the existence of a conspiracy and the commission of acts in pursuance of such conspiracy, and the jury were to consider such evidence of other offenses, if any were shown, in that light, only. Instructions 37, 38 and 39 were on the subject of the attempted proof of an alibi, and it is admitted were in the words substantially approved by this court in other cases. It is claimed they were prejudicial under the evidence in this case, but we do not so consider them. Instruction 44 told the jury they could not find defendants guilty by reason of the fact that Bertsche, Frank Ryan, Edward McCabe and others, or any of them, obtained large sums of money from Mrs. McEldowney, Mrs. Rapp and others, by means and by use of the confidence game, but that the evidence with reference to obtaining such

money, if any such was shown, was to be considered together with all the other evidence in the case. Instruction 46 told the jury that circumstantial evidence was legal evidence, and would warrant a conviction if the facts and circumstances proved satisfied the jury, beyond a reasonable doubt, of defendants' guilt.

We have examined the complaints made of the court's rulings in refusing instructions offered by defendants and are of opinion there was no reversible error in the rulings. Taking the instructions all together, the jury were fairly instructed as to the law and as to the rights of the defendants. Some of the propositions embraced in the refused instructions were in given instructions. The jury were explicitly and clearly instructed that they would not be authorized to find defendants guilty of any offense except the one charged in the indictment,—that of receiving $500 on January 4, 1913,—and if that charge was not sustained they were to be found not guilty. They were instructed what the purpose was in offering proof of other crimes but instructed that defendants could not be found guilty of such other crimes, if any were shown.

The record, as in the *Halpin case,* is not free from error, but it is free from any error that would justify a reversal of the judgment. The purpose of a criminal trial is to determine whether or not the defendant is guilty of the crime charged in the indictment. It is essential that the defendant shall be accorded all the rights he is entitled to under the law, and if errors were committed denying him substantial rights, a reversal of the judgment of conviction would be required. It is not necessary, however, to sustain a conviction that the record should be free from all error, and where guilt is conclusively proven by competent evidence and no other rational conclusion could be reached but that defendant is guilty, it would require more substantial errors than any shown by this record to justify a reversal of the judgment, and it is affirmed.

*Judgment affirmed.*