# The People of the State of Illinois, Defendant in Error, v. Fred Buckminster, Plaintiff in Error.

## Gen. No. 22,426.

1. CONSPIRACY, § 23*—*what is not an essential of crime of.* The gist of a conspiracy is the unlawful agreement, and a consummation of its object or the exercise of the unlawful means is not essential to the crime.

2. CONSPIRACY, § 22*—*when exists in State.* Where a confidence game is begun with artifices to obtain the victim's confidence before the conspirators take him to another State in which the confidence game is consummated, there is a conspiracy to such extent to exercise the unlawful means in the State of Illinois.

3. CONSPIRACY, § 49*—*when evidence of defrauding of others by confidence game is admissible.* In a criminal prosecution for conspiracy to defraud by means of the confidence game, evidence that defendant and certain others had attempted with others of the co-conspirators to defraud witnesses by similar schemes, *held* admissible as tending to show guilty knowledge and intent on the part of the defendant.

4. CONSPIRACY, § 49*—*when error to require defendant to answer questions whether acquainted with notorious confidence men.* In a criminal prosecution for conspiracy to defraud by means of the confidence game, it is error to require defendant to answer questions as to whether he was acquainted with certain notorious confidence men, especially where he answers in the affirmative and one of the men referred to is not one of his co-conspirators.

5. CRIMINAL LAW, § 160*—*what is evidence of guilt.* The fact that an accused resorts to manifest perjury to explain his connection with criminals does not comport with innocence.

6. CONSPIRACY, § 50*—*when evidence shows guilt beyond reasonable doubt.* In a criminal prosecution for conspiracy to defraud by means of the confidence game, evidence *held* sufficient to show defendant's guilt beyond a reasonable doubt.

7. CRIMINAL LAW, § 553*—*when judgment of conviction not disturbed because of improprieties of counsel.* Where the guilt of a defendant in a criminal case is established beyond a reasonable doubt by an overwhelming amount of convincing proof, the judgment against the accused will not be disturbed because of improprieties of counsel, although ordinarily such conduct would be cause for reversal, where another trial would not properly result in a different verdict.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The People v. Buckminster, 207 Ill. App. 230.

Error to the Criminal Court of Cook county; the Hon. ROBERT
E. TURNEY, Judge, presiding.   Heard in the Branch Appellate Court
at the March· term, 1916.   Affirmed.   Opinion filed July 19, 1917.

BENJAMIN C. BACHRACH, for plaintiff in error.

MACLAY HOYNE, for defendant in error; GEORGE C.
BLISS, of counsel.

MR. JUSTICE McDONALD delivered the opinion of the
court.

Plaintiff in error, Fred Buckminster, was found
guilty of conspiracy and sentenced to serve three years
in the penitentiary.   By this writ of error it is sought
to reverse the judgment of the lower court because of
certain alleged errors in the record.

The indictment charged that plaintiff in error,
together with one May and one Miller, conspired to-
gether, and with divers other persons whose names
were unknown to the grand jurors, to obtain money
from one Martin Hupe by means of the confidence
game; also with obtaining money by false pretenses,
contrary to the statute, etc.

The prosecuting witness (Hupe) testified that he
lived on a farm near Homewood, Cook county, Illinois;
that on or about May 18, 1915, a large red automobile
was stopped in the road near his place; that he thought
it contained four passengers; that among them was the
plaintiff in error, who was driving the car, and one
Miller; that, thinking they had lost their way, he ap-
proached them, whereupon the said Miller engaged him
in conversation, informing the witness that he desired
to purchase a farm in that locality; that after discuss-
ing the relative merits of farm lands in that vicinity,
the said Miller asked if his (Hupe's) farm was for
sale, whereupon Hupe stated that the farm no longer
belonged to him, he having sold it to his son; that Mil-
ler then stated that he would like to inspect some farms

in that locality with a view to purchasing one, and asked if he (Hupe) would go along and give him the benefit of his many years of agricultural experience, in selecting land, for which the said Miller offered to pay the witness $5 per day; that he (Hupe) readily assented thereto, and that the said Miller then stated that they would call for him within a few days; that they returned within a few days as agreed, and the three, i. e., plaintiff in error, Miller and Hupe, started out, ostensibly in search of a farm; that they went to various places near by, but without selecting one, and that after several hours of driving, they paid him $5 and took him back home; that the said Miller then informed the witness that he had a few Indiana farms in view, and requested him to go along to give his opinion on their value, to which he agreed, and Miller then stated that they would call for him within a few days; that they returned within the specified time, and the three started on the proposed trip to Indiana; that as they approached East Chicago, Indiana, plaintiff in error intimated that there was something wrong with the automobile in which they were riding, which would necessitate taking it to a garage immediately; that they then proceeded to East Chicago, where plaintiff in error made inquiry as to the nearest garage, and, upon being told of one, drove the car to the place designated; that meanwhile he (Hupe) and the said Miller stopped at a nearby saloon for a drink while plaintiff in error drove to the garage; that plaintiff in error returned from the garage a few minutes later, and informed the said Miller that it would require an hour to make the necessary repairs to the car; that the said Miller then suggested to the witness that the two, i. e., Miller and Hupe take a walk in the meantime, to which the latter consented.

It further appeared from the testimony of Hupe that he and Miller had walked but a short distance when

they passed a man counting a large roll of paper money, whose appearance bespoke opulence, and whom the said Miller recalled having seen in St. Louis a short time before, and who, Miller explained, was reputed to have won about $100,000 on horse races a short time before. This belief was quickly verified, when the said Miller accosted the "stranger" in question, who modestly admitted having made a "killing" on the races, but stated that his winnings amounted to only $80,000. The "stranger" (whose name the witness afterwards learned was May) and Miller then conversed, within the hearing of Hupe, along lines calculated to arouse the curiosity of the latter, at the end of which May agreed to let the said Miller and Hupe "in" on a few good bets.

The said Miller and Hupe, in company with their newly-acquired "friend," then walked down the street together until they reached an old frame building, which they entered. This frame structure was equipped with paraphernalia which, according to the testimony of Hupe, must have been similar to that used in betting establishments. In one room there were several old chairs and a table; in another there were blackboards, a bell and various other devices, and a "caller" who announced the results of the "races." In brief, the place must have had the appearance of a handbook establishment, or at least must have borne enough similarity to one to deceive the inexperienced gambler.

Within a short time May left his two companions and walked into another room to place a small "bet," which a few minutes later he stated netted him ten per cent. profit; these successful "bets" were repeated in increasing amounts, apparently to impress the credulous Hupe with the marvelous facility with which May could win money, until May had "won" $4,000.

The said May then suggested to Hupe and the said Miller that they place a large bet on a "sure winner,"

which, after some persuasion by Miller, Hupe acquiesced in. Accordingly the "bet" was placed, May selecting the horse upon which they were to wager their money; but instead of putting up the currency, the three signed a card or check for $4,000, this being the amount wagered on the "race."

Presently it was announced that they had won $14,-000, but the "cashier" informed Hupe that, in accordance with an inflexible rule of the institution, no bets were to be paid until the winner could show that he was financially able to meet the amount of his check. The said Miller and Hupe then held a consultation, the upshot of which was that the two agreed to go to their respective banks and raise enough money to make the proper showing with the "cashier" in question, to enable them to collect the $14,000.

Accordingly May, Miller and Hupe walked to the garage where they found plaintiff in error in waiting. Miller then ordered plaintiff in error to take the said May and Hupe to Homewood, where the latter was to draw $3,500 of the money just referred to, Miller agreeing to go to Chicago immediately to raise the balance of the $4,000 bet. In company with plaintiff in error and May, Hupe went to Homewood, drew the money from the bank, and the three made a hurried return to East Chicago, where the money was promptly turned over to the "cashier" of the aforesaid gambling institution, $500 being in currency and $3,000 in the form of a cashier's check.

Having fulfilled his part of the agreement, Hupe then demanded payment of the bet. Needless to state, the money was not forthcoming, numerous excuses being made therefor. It then dawned upon Hupe for the first time that the entire scheme appeared suspicious. In due course the cashier's check for $3,000 was deposited in a Chicago bank by plaintiff in error, who immediately drew $2,000 against it. In the meantime, Hupe, after being satisfied that he had been duped, or-

dered payment stopped on the $3,000 check. Plaintiff in error was notified thereof, and subsequently returned to his bank $1,500 of the $2,000 received on this check. The episode resulted in a net loss to the said Hupe of $1,500.

The first point raised by plaintiff in error is, that the Criminal Court of Cook county had no jurisdiction of the crime charged because the evidence shows that the agreement constituting it contemplated the exercise of the confidence game in another State. The logic of this contention is that the conspirators can circumvent the law if they make as one of the express terms of their agreement that they will get the money by the confidence game in another State, no matter how far they may exercise their contemplated means to that end in this State.

The gist of a conspiracy is the unlawful agreement, and it is conceded that a consummation of its object or the exercise of the unlawful means is not essential to the crime. *Ochs v. People,* 124 Ill. 399; *Gallagher v. People,* 211 Ill. 158.

The evidence, however, shows that part of the acts constituting the confidence game were practiced in this State. The confidence game began with the artifices to obtain the victim's confidence before the conspirators took him to Indiana. To that extent they conspired in Illinois to exercise the unlawful means in this State.

It is also strenuously argued by the plaintiff in error that the court committed reversible error in the admission of certain evidence by the witnesses Stein and Gottschalk, on behalf of the prosecution.

The witness Stein was permitted to identify plaintiff in error as the man who, under the *alias* of Curtis, had called at his place of business and represented himself as a manufacturer seeking to invoke his assistance in locating a desirable factory site; that a few days later, plaintiff in error invited him to dinner at

the Auditorium Hotel, where he introduced him to one Wilson, who was represented as a mining engineer of Brooklyn, New York, but whose real name was Weil, and who was more commonly known as the "Yellow Kid."

While this testimony did not show conclusively that the participants had actually conspired to defraud the said Stein, yet the circumstances surrounding these activities at least tended to show, in its embryonic state, a scheme similar to that described by the prosecuting witness, Hupe. At any rate, the evidence was admissible as tending to show a guilty knowledge and intent on the part of plaintiff in error who steadfastly disclaimed any guilty knowledge of the fraudulent activities of his co-conspirators.

What we have just said applies with equal force to the testimony of Gottschalk, the banker, located at Homewood, who testified that plaintiff in error called at his place of business on March 31, 1915, introducing himself as Frederick Bateman of New York, dealer in real estate; that he was seeking to purchase a tract of land in the vicinity of Homewood, and that plaintiff in error made a deposit of $1,000 in his bank under the name of Bateman. In the course of the negotiations which followed this visit, Gottschalk met several supposed accomplices, including one "Harrison," one "Spelsy," and the aforesaid Yellow Kid. According to Gottschalk's testimony, a deal for the sale of his real estate had been arranged and the parties agreed to meet at the office of his attorney in Chicago to close the deal. Needless to state, they never appeared, plaintiff in error in the meantime having withdrawn his deposit of $1,000 from Gottschalk's bank.

The witness Olson testified that he was defrauded out of $10,000 the latter part of June, 1915 (a few weeks after the Hupe incident) on fictitious horse race bets, by a gang of confidence men including plaintiff in error, the aforesaid Miller, May, Weil (the Yellow

Kid) and others. The details which he related in his testimony are strikingly similar to those testified to by Hupe in describing his experience with these notorious lawbreakers; plaintiff in error being the chauffeur of the same red automobile which was "disabled" as they approached East Chicago, necessitating immediate attention; the walk to the gambling house, and the subsequent betting on "fake" horse races.

Complaint is made that plaintiff in error was unduly prejudiced by being required to answer questions regarding his acquaintanceship with certain notorious confidence men, viz., one Strosnider, and the aforesaid Weil. And it is strenuously argued that his affirmative answers to the questions seeking to elicit this information were highly prejudicial.

In our opinion, it was error to admit this evidence, particularly with reference to any acquaintanceship with the said Strosnider. There is no evidence in the record in any way connecting Strosnider with the conspiracy here charged. As to the aforesaid Weil, there is evidence showing that he did have some part in the furtherance of this high-handed scheme. Nevertheless, we think the questions were improper as not bearing directly upon the issues here involved, and objections thereto should have been sustained.

The evidence shows beyond a reasonable doubt that plaintiff in error, along with others, had conspired to defraud innocent people out of their money; that in at least two instances they succeeded, and it tended to show that other unsuccessful attempts had been made. And although plaintiff in error now seeks to assume the rôle of an innocent victim who was induced to drive an automobile containing criminals who were bent on committing crime, yet we think the evidence shows that he was acting with full knowledge of their intentions and operations, and aiding in carrying them out.

There are numerous circumstances in evidence

which refute his profession of innocence. For instance, when he called at the Homewood State Bank he introduced himself to the aforesaid Gottschalk as Frederick Bateman and represented that he wanted to purchase a factory site. His explanation for the assumption of a fictitious name at that time was, that he feared it might become known to his creditors that he had deposited $1,000 in the bank at Homewood, and they might seek to attach it. Yet the evidence shows that at that very time he had an account with a Chicago bank in his real name.

Plaintiff in error also testified that he met the aforesaid Miller in a casual way, by reason of the fact that he was at that time endeavoring to sell his automobile and Miller was in the market for one. The falsity of this testimony became manifest when plaintiff in error admitted on cross-examination that he did not own the automobile in question, and nullified his explanation that the meeting with Miller was the result of the aforesaid coincidence. The fact that he resorted to manifest perjury to explain his connection with criminals does not comport with innocence.

Plaintiff in error also testified that he cashed the $3,000 check which the aforesaid Miller had fraudulently obtained from Hupe, and explained that this was done merely as an accommodation; that he had no pecuniary interest in it, and that at the time he was without knowledge as to the transaction from which it emanated, although he admitted that he afterwards learned through his bank that it had been fraudulently obtained from the aforesaid Hupe. However, in the face of this knowledge, we find plaintiff in error, a few weeks later driving the same red automobile, with the aforesaid Miller and Olson as his passengers, to the same destination, and the same significant circumstances following in regular order, viz., the breaking down of the automobile as they neared East Chicago, the trip to the garage, and the subsequent horse race swindle.

It is indeed singular, to say the least, that a man who possessed the intelligence of the plaintiff in error; a man who had spent years as a detective on the Chicago police force; a man whose business brought him in frequent contact with all classes of criminals, could be so gullible as to be imposed upon by a gang of artful swindlers; and to expect a jury, in the face of evidence of unmistakable guilt, to believe that plaintiff in error was the unsuspecting tool of this band of unscrupulous rogues is to place too severe a tax on their credulity.

The record is replete with the conflicting statements of the plaintiff in error wherein he unsuccessfully sought to explain acts which on their very face bespoke his guilt. And while the record reveals improprieties committed by the prosecuting attorney prejudicial to the defense, which ordinarily would necessitate a reversal of the judgment, yet, viewed in the light of the competent evidence in the case, the guilt of the plaintiff in error has been shown beyond a reasonable doubt, by an overwhelming amount of convincing proof, and we are satisfied that a retrial of the cause could not properly result in a different verdict. Therefore, following the rule laid down by our Supreme Court in *People v. Cleminson,* 250 Ill. 135, and later followed in *People v. Halpin,* 276 Ill. 363, the judgment should not be disturbed for the purpose merely of making a better record. Accordingly the judgment will be affirmed.

*Affirmed.*