## The People of the State of Illinois, Defendant in Error, v. Frank Curran et al., Plaintiffs in Error.

## Gen. No. 22,634.

1. Criminal law, § 211*—*when conduct of court not improper.* The conduct of the trial judge, in a criminal prosecution for conspiracy, in manifesting sternness towards all the defendants and using reproving language towards defendants' counsel, *held* to be proper.

·2. Criminal law, § 213*—*when proper for court to call witnesses as own.* A court, in a criminal case in which witnesses are hostile to the State, may call such witnesses as its own, and allow the State's counsel to cross-examine them.

3. Criminal law, § 218a*—*when leading questions permissible on cross-examination.* Where witnesses called by the court as its own and cross-examined by the State are hostile to the State, leading questions are permissible, in the discretion of the court.

4. Criminal law, § 211*—*when conduct of court towards and in presence of jury not error.* The conduct of the court, in a criminal prosecution for conspiracy, in addressing the jury in approval of their verdict after they have returned such verdict is not error where there is no evidence of his partiality.

5. Records, § 7*—*binding effect of record.* Parties to a criminal case are bound by the record.

6. Conspiracy, § 20*—*what constitutes common law.* A common-law conspiracy is a combination of two or more persons to do a criminal or unlawful act, or to do a lawful act by criminal or unlawful means.

7. Conspiracy—*when indictment charges common law.* Counts in an indictment for conspiracy concluding "contrary to law," *held* sufficient to charge a common-law conspiracy.

8. Conspiracy, § 41*—*when indictment sufficient.* An indictment charging in terms a conspiracy to commit a crime by obtaining money by threats is sufficient, and it is immaterial whether it charges a common-law or statutory offense.

9. Conspiracy, § 8*—*unlawfulness of boycotts.* Boycotts are unlawful.

10. Conspiracy, § 38*—*when one good count in indictment sufficient.* One good count in an indictment for conspiracy is sufficient to support a verdict.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The People v. Curran, 207 Ill. App. 264.

11. CRIMINAL LAW, § 409*—*when overruling of motion not preserved for review.* The objection that the court erred in overruling defendant's motion for a bill of particulars, *held* not preserved for review.

12. INDICTMENT AND INFORMATION, § 45*—*when motion for bill of particulars properly denied.* A motion for a bill of particulars in a criminal case is properly denied where all the substantial and material facts proved are shadowed forth with sufficient particularity in the various counts of the indictment.

13. INDICTMENT AND INFORMATION, § 45*—*when bill of particulars allowed.* The allowance of a bill of particulars in a criminal case is a matter within the sound discretion of the trial court, and will not be cause for reversal unless it clearly appears that defendants are damaged thereby.

14. INDICTMENT AND INFORMATION, § 45*—*when bill of particulars not allowed.* In a criminal prosecution for conspiracy, it is not error to refuse a bill of particulars where defendants are in nowise circumscribed in their defense by such refusal and the charges in the indictment are familiar to them all.

15. CONSPIRACY, § 50*—*when evidence sufficient to support verdict of guilty.* In a criminal prosecution in which defendants were charged with maintaining a boycott and obtaining money by means of a boycott, evidence *held* sufficient to support a verdict of guilty.

16. CRIMINAL LAW, § 525*—*when errors in rulings on evidence not ground for reversal.* A judgment in a criminal case will not be disturbed because of errors in rulings on evidence where there is sufficient competent evidence to establish the defendants' guilt.

17. JURY, § 50*—*when juror may be excused.* It is within the discretion of the trial court to excuse a juror from service after he has been sworn to try the case.

18. JURY, § 72*—*when disallowance of peremptory challenge proper.* A peremptory challenge of a juror after he has been sworn is properly denied, and he can only be challenged for cause.

19. JURY, § 50*—*when duty of court to discharge juror.* It is the duty of the trial court to discharge a juror who has been sworn, if it appears that owing to illness he will be unable to sit through the trial.

20. CRIMINAL LAW, § 220*—*when examination of witnesses within discretion of court.* It is within the discretion of the trial court in a criminal case to allow the production and examination by the State of witnesses whose names are not upon the indictment, and such discretion cannot be reviewed where defendants are not taken by surprise.

21. CRIMINAL LAW, § 220*—*when defendants may not complain*

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

*of examination of witnesses whose names are not indorsed on indictment.* Where the court in a criminal case affords defendants' counsel every opportunity to examine witnesses whose names are not on the indictment, confer with them and tender them for such purpose, and counsel do not avail themselves of such privilege, they cannot be heard to complain of the examination of such witnesses by the State.

22. CRIMINAL LAW, § 494*—*when defendants cannot complain of objectionable remarks by counsel for State.* Defendants in a criminal case cannot complain of objectionable remarks by counsel for the State in their closing argument where such remarks were incited by arguments of counsel for defendants and were used in answering such arguments.

23. CRIMINAL LAW, § 234*—*when remarks of counsel for State are improper.* In a criminal prosecution for conspiracy, where, at the conclusion of the evidence, the State dismissed as to two defendants and one of the defendants' counsel criticised the State's attorney for not dismissing them sooner, *held* that remarks in the closing argument of counsel for the State, that the reason why he had not dismissed the case earlier as to such defendants was that he had waited until the case was closed in the expectation that the dismissed defendants would take the stand and he would have the opportunity of cross-examining them, were proper, but the further statement, that an honest man against whom a charge is made invites investigation and puts himself there (indicating witness stand) and submits to any kind of a question, and asking why such defendants did not do it, was improper.

24. CRIMINAL LAW, § 525*—*when improper remarks of counsel for State not ground for reversal.* Improper remarks of counsel for the State are not ground for reversal where the evidence as to the guilt of the defendants is clear.

25. CRIMINAL LAW, § 590*—*when improper remarks of counsel for State not ground for reversal.* Improper remarks of counsel for the State in a criminal prosecution in stating that an honest man invites investigation of his conduct, and asking why certain defendants had not gone on the witness stand, *held* not ground for reversal, where the court instructed the jury not to consider such remarks, and, in the selection of the jury, each juror was frequently told by defendants' counsel that the law did not require any defendant to take the stand.

26. CRIMINAL LAW, § 234*—*when comments of counsel for State not improper.* Comments of counsel for the State, in a criminal prosecution for conspiracy, in answering an argument of one of the counsel for defendants who stated that he was willing to go

to the penitentiary and serve a year of his client's time, *held* not improper.

27. CONSPIRACY, § 35*—*when charge sufficient*. The charge in a criminal prosecution for conspiracy involving a boycott and obtaining money by means of a boycott, *held* sufficient.

28. CRIMINAL LAW, § 570*—*when refusal of instructions not reversible error*. The refusal of requested instructions for defendants in a criminal case is not ground for reversal where, if given, the jury would not have been justified in returning a different verdict.

Error to the Criminal Court of Cook county; the Hon. KICKHAM SCANLAN, Judge, presiding. Heard in this court at the October term, 1916. Affirmed. Opinion filed October 2, 1917. Rehearing denied October 15, 1917.

**Statement by the Court.** Fifty-four persons were indicted by the grand jury of Cook county for criminal conspiracy. While examining veniremen the State *nollied* as to five of the defendants, at the close of the People's proofs likewise *nollied* the case as to defendant Raymond Cleary, and at the close of all the proofs also *nollied* the case as to the defendants Geimer and Lindloff. The cause went to the jury as to the remaining defendants, all of whom were found guilty with the exception of William F. Clauss, Tom Kelly and John White, who were acquitted. The defendants Jack Cleary and J. H. Murphy were fined, the former $2,000 and the latter $500, which fines they paid and were discharged. The jury fixed the punishment of Charles Crowley and Fred Mader at three years each in the penitentiary, of Ray C. Stewart, Hugo Hahn and Walter E. Staley at two years each in the penitentiary, and of Frank Curran at one year in the penitentiary. William E. Nestor, Harry H. Grass and Isadore Gordon were fined $2,000 each, Charles W. Hanson $1,500, Nicholas Pekelsma $750, and George Tuckbreiter $500. From a judgment on the verdict, the twelve last-named defendants prosecute this writ of error.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

The cause went to trial on a fourteen count indictment, the third count of which concludes "contrary to the statute," while all of the other counts conclude "contrary to law."

The first six counts charge a conspiracy directed against one Hoffman. Counts 8, 9, 10, 11 and 12 charge a conspiracy against a class of individuals and have reference to the full scope of the conspiracy. Counts 13, 14 and 15 charge in a restricted form a conspiracy against a number of persons, naming them. Count 3 also charges a conspiracy to obtain money from Hoffman by false pretenses, such false pretenses consisting of a representation made to Hoffman that the demand for money made upon him was in the nature of a fine and a penalty to be paid to the union for violation of union regulations. Counts 2 and 5 charge a boycott, and count 6 charges a conspiracy to maliciously injure and destroy Hoffman's property by breaking plate glass in his building. Count 8 charges a conspiracy to boycott a class of individuals owning buildings with plate glass in them, upon failure of such owners to pay money. The 9th count charges a conspiracy to extort money by threats to injure and destroy the property of a class of individuals. The 10th count charges a conspiracy to injure business of a class, and count 11 charges a conspiracy to boycott a class. The 12th count charges a conspiracy to maliciously destroy property. Count 13 charges a conspiracy to boycott upon failure to pay money. The 14th count charges a conspiracy to extort money by threats from divers persons named. The last count charges conspiracy to boycott a number of individuals named, with reference to the employment of labor, purchase of building supplies, etc.

All of the defendants in this review were officers of certain unions. George Tuckbreiter was business agent for the Painters' Union and had previously been president of his local union. Frank Curran, Isidore

Gordon, Harry H. Grass, Charles W. Hanson, William E. Nestor and Nicholas Pekelsma were business agents of the Painters' District Council of Chicago, each of these defendants representing one of the districts into which the city had been divided. Ray C. Stewart was business agent of the Wood Finishers' Union and a member of the Painters' District Council. Walter E. Staley and Hugo Hahn were business agents of the Glaziers' Union. Charles Crowley and Fred Mader were representatives of the Electrical Fixture Hangers' Union.

From the evidence it is proven that the defendants now before the court entered into a conspiracy, which extended over several years, to extort money from numerous citizens of Chicago; that the system of extortion was widespread and that while in the neighborhood of sixty instances of extortion by the conspirators were proven, other extortions were practiced. It appears that the conspiring defendants were able to control the market as to plate glass; that they proceeded by searching out persons in Chicago who owned buildings in which were plate glass windows, and, pretending that union labor had a grievance against such owners, would, upon one pretext or another, put such persons on a black list, and under an arrangement with the glass dealers of Chicago would boycott them and prevent them from purchasing glass from such dealers. This black list, made up by the defendants and others, was issued twice a week and circulated among the glass dealers. The *modus operandi* of attack was for one or more of the defendants to make a demand upon the owner of the building of which plate glass was a part, for money as a union fine for his having had work done by nonunion labor or for using material that was not made by union men. Such owner failing to comply with such demand, the plate glass in his building would be smashed at night. Thereafter, when such owner submitted to the extortion and

paid the money demanded or agreed upon, the boycott would be raised and the plate glass furnished by the dealers and put in without further molestation or disturbance. Where there was any foundation for the charge that work or material had been furnished by nonunion labor, and the owners offered to take out the offending work and replace it with union construction, such offers would be rejected as unsatisfactory and as not equivalent to the money demanded. After the money extorted was paid, all questions of union ethics were abandoned and the victim was allowed to proceed in the setting in of plate glass without any other condition being imposed. That glass dealers innocently participated in this boycott may be doubted. They recognized the situation, refusing to furnish glass to any one upon the black list until such party's name was, by the direction of the conspirators, removed from the black list. All of the defendants were acquainted with each other and came into constant association day by day both at the headquarters, where the business agents of the several unions met, and at the saloon of one Johnson, where most of the victims met the conspirators and paid the money extorted. The evidence shows that each defendant took an active part in demands for money from the victims of their extortions and in the actual receiving of such money. It further appears that the money extorted was appropriated by the defendant conspirators to their own personal use and that none of it was paid out for any union or used for any lawful purpose.

While there is no proof that any of the conspirator defendants personally broke any of the windows in buildings of their victims, yet such breaking is proven to have followed soon after a demand for money and a refusal to pay; also that upon payment of the money demanded the boycott was removed and the glass immediately furnished. The record contains evidence

of many of these instances of extortion, a number of which we will recite as typical of all.

One Hoffman, who owned the building 3101 Lincoln avenue, Chicago, put into it a new front and some electrical wiring. He hired electricians of Local 376, thinking he was employing union labor. Mader, Crowley and Jack Cleary forced Hoffman to pay $400. Mader, after cursing the electrician who installed the electrical work in the Hoffman building, told him that if Hoffman would "come across" with $300 everything would be square, otherwise it would cost Hoffman $500, and Hoffman would wake up some morning and there wouldn't be any windows in the store frame. A few mornings thereafter Hoffman did find three plate glass windows smashed. Hoffman endeavored, without success, to get glass from the dealers to replace that which was smashed. He then went to see Mader at Johnson's saloon, where Mader demanded $500 and told Hoffman that unless that sum was paid the glass would not be put in. Hoffman tried to get the amount reduced; Cleary took Mader aside and talked with him and then returned to Hoffman and told him that he would knock off his $100 and that was the best that could be done. Thereupon Hoffman paid the $400 and the plate glass was put in and remained without disturbance.

Joseph Plucinski, in the clothing business at 1136 Milwaukee avenue, hung some electrical fixtures at a cost of $14.90. After the work was done he was called on the 'phone by some one who inquired as to who did the work. A couple of days thereafter two plate glass windows were broken. Being unable to get the windows set, he was directed to Johnson's saloon, where he went and inquired for Mader, who told him it would cost him $100, that he would have to buy new lamps and sign a new contract for hanging them, which he refused to do. A few days later he

returned and saw defendant Crowley. Crowley told him it would cost him $470. He finally settled with Crowley for $300. The next morning after the money was paid the glass was put in and no changes were made in the fixtures.

Jacob Hartman operated a bakery at 2729 West Division street and had some electrical work installed in his place of business. Several persons called and left Mader's card, and Mader said, "You will have to come over to our office and settle up with us." Three days thereafter two plate glass windows were broken and Hartman tried, without success, to have the insurance company reset the glass; he was directed to Johnson's saloon, where he went and met defendants Staley and Mader, the latter telling him it would cost him $250 to get the glass put in. Hartman remonstrated, saying he didn't have the money. Mader replied, "I don't care if you hold up somebody and bring us the money." Hartman paid $125 at Johnson's saloon in settlement, and twenty minutes after he returned home the plate glass was being put in. No change was made in the electrical work, his name was taken off the black list, and the glass as reset was not again broken.

One Dolazinski owned a bakery on North Ashland avenue. Defendant Crowley accosted him and wanted to know who had hung his electrical fixtures. The same night his windows were broken. He went to Johnson's saloon and saw the defendant Tuckbreiter and talked with him and Crowley, who demanded $300, which he refused to pay. While he was going away the defendant Grass told him he had better pay $300 or he would never be able to get his windows put in. This trouble was adjusted by the payment of $150 by Dolazinski, whose name was removed from the black list and his windows reset at once without further trouble.

Rusnak Brothers, furniture dealers at 2652 North

avenue, were on August 14, 1915, put upon the black list. Four days thereafter two of their plate glass windows were broken. They attempted to have the glass dealers reset them, but were refused on the ground that they were on the unfair list. On payment of $750, which was paid in Johnson's saloon, the Rusnaks were taken off the black list and plate glass immediately furnished and reset. The pretense for extorting this money was the claim that "scab" work had been done on the Rusnak building; however, the work was not disturbed, but allowed to remain after the $750 was paid without further question.

One Marcinkiwicz owned a lot at 4609 South Ashland avenue, on which was an old building which he had remodeled and put in some electrical work. Shortly after doing so he endeavored to put in some plate glass. Defendant Staley demanded $250 and told Marcinkiwicz that "unless he paid it he would not be able to get any glass in ten years." To this demand he did not yield, but boarded up the building and never thereafter used it. The following year he moved the building off the lot and started to erect a new one. That he employed union labor in the erection of the new building was not disputed. Marcinkiwicz endeavored to purchase plate glass for his windows, but was refused by the dealers. Staley extorted from him $100 as a condition of permitting plate glass to be set. The demand was based upon conditions prevailing at the old building, which old building Marcinkiwicz never used. The day following the payment of the $100 the plate glass was put in and the trouble ceased.

Joseph Pakauloz remodeled the building at 11853 Michigan avenue, in which he conducted a grocery and meat market, and, in so doing, some electrical work was installed by the Commonwealth Edison Company. Kelly, who was acquitted, said the company were "scabs" and with an oath told Pakauloz to tear down

the building or they would tear it down for him; that he should make it right with the union. Being unable to get union labor to put in the glass, he set the plate glass himself, and two weeks thereafter, in the night, it was broken and he was unable to get it reset. He was told to go to Johnson's saloon, which he did, and there met Kelly and the defendant Staley. After some profanity Pakauloz was told to pay $300. On a second visit to the saloon he saw Staley and paid him $50. Immediately thereafter the trouble ceased and he was able to procure plate glass for his windows.

On a similar pretense Cleary extorted from Adolph Feldman, who remodeled his premises at 1253-55 South Halsted street, $150, which money was paid to defendant Hahn, and the morning following the payment the plate glass was put in without any change being made or exacted in the work done by nonunion labor.

One Freeman paid defendant Stewart $300 in a similar way, Stewart threatening a strike unless the money was paid.

Nathan Rosenthal, doing business at 31 South State street, was put on the black list and his windows were smashed, the reason given being that he had the outside of his building painted by nonunion labor. Before the breaking of the windows defendant Curran's card was left at Rosenthal's place. He settled by paying Curran $100. The next day his name was taken off the black list. Curran, admitting the transaction, claimed that Rosenthal was "a white Jew" and gave him the money as a present.

Curran extorted another $100 from one Frank Hunt, who runs the Jackson Hotel, the windows of which were smashed, and about three hours after the payment of the $100 plate glass was furnished and reset. This money was exacted on the pretense that Hunt had had his place decorated by nonunion labor; but after the payment of the money such work remained undisturbed.

One Handelsman leased premises at 3201-3217 Twelfth street, which contained twelve stores. He had some painting done on the building by union labor, but he was put on the black list. The painters stopped work and Handelsman saw defendant Nestor and asked him the reason for the stopping of the work, as he had all union men employed and paid the union price, whereupon Nestor responded, ''There is no use arguing about it. We've got you down for $150, but you are a pretty nice fellow and we will let you off for $50.'' Handelsman tendered a check and Nestor rejected it, saying, ''Not that kind of stuff.'' Handelsman paid the $50 in money and the job of painting continued. The reason for this exaction was stated by Nestor to be that Handelsman worked for the Kimball Piano Company, which had employed a nonunion man to paint one of the Kimball stores, so they stopped work on Handelsman's property. Handelsman's statement in reply, that he was only on a salary with the Kimball Company and had nothing to do with their work, made no impression upon Nestor.

Morris Peskind, a laborer, owned a two-flat building at 1557 Turner avenue, which he remodeled, and was unable to get plate glass for his windows because he was on the black list. He saw the defendant Grass, who demanded $200. The grievance against Peskind was that he had painted his own woodshed in the rear of the lot where he lived. Nestor compromised the matter by taking $25 on account and $35 in instalments and thereafter there was no trouble about the glass nor was it necessary to have any union painter repaint the woodshed.

One Berry, a carpenter contractor, was a contractor for a building at 825 Lombard avenue, Oak Park. He let the glass work and painting to a nonunion man. The union lathers thereupon stopped work and Nestor appeared upon the scene. He told Berry that his place was fined $250. Berry compromised by paying Nestor

$225, and the nonunion man proceeded to complete the job without further interference.

Jim Palermo, a hodcarrier, had a two-flat building on which repairing was done. He was visited by three persons, who came to ascertain if the work was done by union labor; the plate glass in his building was smashed; he failed to get the glass reset and saw defendant Gordon at Johnson's saloon. Gordon demanded $200 and Palermo offered $50, which was refused. Thereupon Palermo put in a frame with small glass instead of plate glass. It does not appear that his building was afterwards molested.

Defendant Grass extorted from Simon Hodes $200. The pretext for the demand was that Hodes had employed nonunion painters. Before the payment of the money by Hodes, two plate glass windows in his building were broken, which were restored at once. Two or three days thereafter the new ones also were broken, but after the money was paid the windows were again restored and there was no further trouble.

Isadore Jacobson had windows in his flat building at 833 East 63rd street broken three times. A demand for $200 was made, which was refused and $100 offered. After the third breaking Jacobson's name was removed from the black list, and there is a strong inference from the testimony that the demand was met. However, the fact remains that a demand for money was made and that the windows were broken three times and were subsequently reset.

All of the defendants except Mader and Crowley testified in their own behalf.

A body styled "Electrical Union No. 376," which had seceded from the regular union, furnished an opportunity for defendant conspirators to practice their extortions. It was work done by members of this union that the conspirators claimed to be irregular. The unions claiming that Union 376 was not legitimate were Painters', Glaziers' and Electrical Unions Nos. 134

and 381.   However, the Building Trades Council, the parent body of the last-named unions, ordered that the individuals making the black lists cease doing so; but that order was not obeyed, as appears from the foregoing recital of extortions made by the conspirator defendants.

Defendants moved to quash the indictment and each count thereof, and as to the counts before the court the motion was denied.

A motion for a bill of particulars was, with the exception of furnishing the address of Hoffman's premises, overruled.

After the first panel of four jurors was sworn to try the case the court excused, for physical disability, Juror Brown.   Thereupon defendants peremptorily challenged Juror Shaw, one of the three remaining sworn jurors of the panel, which challenge was overruled.

The trial took nearly three months, eight weeks of which were spent in the selection of the jury.

There are forty-two assignments of error upon the record, among which are the court's action in overruling the motion to quash the indictment; in denying the motion for a bill of particulars; in denying the peremptory challenge of Juror Shaw; in calling witnesses at the instance of the People; in permitting the State to cross-examine such witnesses; in permitting the People to examine witnesses whose names were not in the indictment; in improperly admitting and excluding evidence; in questioning witnesses unreasonably; in permitting the State's Attorney to comment in his closing argument regarding the failure of certain defendants to take the witness stand in their own behalf; challenging the conduct of the court and of the attorneys for the People; averring error in the giving, refusing and modifying of instructions, that the verdict is not warranted by the evidence, but was the result of passion and prejudice, and that the trial was not fair.

JOSEPH R. BURRES, DANIEL L. CRUICE, WILLIAM A.
CUNNEA, EDWARD R. LITZINGER, WILLARD M. McEWEN,
JOHN E. OWENS and BENEDICT J. SHORT, for plaintiffs
in error.

MACLAY HOYNE, MARVIN E. BARNHART and NICHOLAS
MICHELS, for defendant in error; EDWIN J. RABER and
EDWARD E. WILSON, of counsel.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion
of the court.

A vigorous and severely critical attack is made by
the counsel for defendants upon the conduct of the
learned judge who presided at the trial. We have no
hesitation in repelling this attack by saying that it is
wholly unwarranted. Seldom in the history of trials
in this jurisdiction has a judge been confronted with
so difficult a task as was the judge in this case, and to
the credit of the judiciary be it said that he discharged
the duties imposed upon him with equanimity and fair-
ness and that by no action of his were the rights or in-
terests of the defendants or any one of them prejudiced
in the slightest degree. The defendants were repre-
sented by an array of counsel who, instead of being
an aid to the court, seemed to impose every obstacle
that their ingenuity could suggest in the hope of im-
pelling the court to commit error. At the very incep-
tion of the trial, in an effort to secure a jury, some of
the methods of the conspirator defendants in terroriz-
ing whoever opposed them were made manifest. Talis-
men were intimidated and many of them were excused
from duty through fear of physical violence to them-
selves and their property at the hands of defendants
and those aiding and abetting them. Their fear was
so pronounced that they felt disqualified to sit as dis-
passionate jurors and calmly listen to and weigh the
evidence. The tactics of counsel were such that eight
weeks were consumed in securing the jury. On no

reasonable theory can the consuming of so much time be justified without casting grave reflections upon the legal system which makes it possible or the actions of the presiding judge in tolerating it.  An atmosphere of terror and fear was created by defendants and their counsel, with the apparent intent to overawe the jury in the discharge of their sworn duty.  Happily these machinations proved futile, although the result might have been otherwise but for the integrity of the trial judge's rulings and his firmness of action.

The trial judge, it is charged by defendants' counsel in argument manifested sternness to all the defendants and used reproving language towards defendants' counsel.  The record inclines us very strongly to the opinion that such sternness was essential and that the reproving language used was well merited and necessary to maintain control in an orderly way of the course of counsel in the trial.

The prejudice of the judge, it is further charged, is evidenced by his calling of certain witnesses as the court's witnesses and allowing the State's counsel to cross-examine them.  The witnesses so called were undoubtedly hostile to the State and so proved by their evidence.  The law in this State recognizes that in these circumstances it is the right of the court, in the furtherance of justice, to call such persons as its own witnesses.  What the court said in *People v. Rardin,* 255 Ill. 9, is equally applicable to the instant case:

"The witnesses were friends and associates of the plaintiffs in error, and evidently testified with a view to shield their friends and to shield themselves.  The court was very careful during their direct and cross-examination to safeguard the rights of plaintiffs in error.  We think the practice adopted in taking the evidence of these witnesses was fully justified by the holdings of this court in *Bressler v. People,* 117 Ill. 422; *Carle v. People,* 200 id. 494; *People v. Cleminson,* 250 id. 135." *People v. Baskin,* 254 Ill. 509.

These witnesses were Arnold, Ballard, Schorr and

Kellman. The first two were fellow business agents of the defendants. Schorr was a co-conspirator, not then on trial, and Kellman was friendly with defendants Staley and Hahn and was a member of the Glaziers' Union, and as said in *Cassem v. Galvin,* 158 Ill. 30: "An examination of this record evidences that the witness was unwilling and evasive, and in such cases leading questions are permissible, in the discretion of the court."

The trial judge is again severely criticised for his action in addressing the jury in approval of their verdict after it had been returned and in his attempt to overrule, in the presence of the jury, the motion for a new trial. There are two complete answers to this criticism. Whatever was done after the verdict was rendered is of no moment as affecting the rights of defendants, and in his remarks there is no evidence convicting the judge of partiality or even tending in the remotest degree to show that he had any prejudice against defendants. While we have no doubt that the judge was quite ready and capable of deciding the motion for a new trial at the time the verdict was returned into court, yet he did not do so and gave defendants an opportunity not only to file a written motion for a new trial, which they availed of by assigning forty-eight reasons in writing why a new trial should be granted, but heard arguments upon the motion, took it under advisement and at a later date overruled it and gave judgment upon the verdict; the record shows, concerning the motion for a new trial, that "thereupon a motion for a new trial coming on to be heard, the same was argued by counsel for the defendants and each of them and taken under advisement by the court." The record binds the parties and disposes of counsel's criticism.

We find no error in the court's refusal to quash the indictment. There is nothing in any of the counts of the indictment which is antagonistic to the ruling in

*Town of Paris v. People,* 27 Ill. 74, or *Maloney v. People,* 229 Ill. 593. The counts which conclude contrary to law are sufficient to charge a common-law conspiracy, which is defined as a combination of two or more persons to do a criminal or unlawful act, or to do a lawful act by criminal or unlawful means. The unlawful act need be neither criminal nor indictable to make it a conspiracy. *Chicago, W. & V. Coal Co. v. People,* 214 Ill. 421. While an indictment may be in the terms of the statute, still, if such statute is but a re-enactment of the common law, then a crime at common law is charged and the conclusion "contrary to law" is proper. This indictment charges in terms a conspiracy to commit a crime by obtaining money by threats, and it is of little moment whether the indictment charges a common-law or a statutory offense. *People v. Pouchot,* 174 Ill. App. 1.

Several of the counts charge a conspiracy to boycott. Boycotts are unlawful. *Doremus v. Hennessy,* 176 Ill. 608. As said in *Thomas v. Cincinnati, N. O. & T. P. Ry.,* 62 Fed. 803:

"The combination was unlawful without respect to the contract feature. It was a boycott.  *  *  *  Boycotts, although unaccompanied by violence or intimidation, have been pronounced unlawful in every State of the United States where the question has arisen, unless it be in Minnesota; and they are held to be unlawful in England.  *  *  *  Boycotts have been declared illegal conspiracies in *State v. Glidden,* 55 Conn. 46, 8 Atl. 890; *State v. Stewart,* 59 Vt. 273, 9 Atl. 559; *Steamship Co. v. McKenna,* 30 Fed. 48; *Casey v. Typographical Union,* 45 Fed. 135; *Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co.,* 54 Fed. 730."

· One good count is sufficient to support a verdict. The court said in *People v. Jones,* 263 Ill. 564:

"The jury returned a verdict of guilty. As there are two good counts in the indictment charging an offense which the evidence on the part of the People tends to prove was committed, they are sufficient to sustain a conviction under a general verdict of guilty, and the

motion in arrest of judgment was therefore properly denied.''

*People v. Darr,* 179 Ill. App. 130; *People v. McCann,* 247 Ill. 130. In the *McCann* case, *supra,* the court said:

"The fifth count being good, it was sufficient to support the judgment, and even if the other counts are defective, the denial of the motion to quash was not such error as to require a reversal of the judgment."

If in this case there should be any difficulty with either count, the verdict would be referable to any good count found in the indictment, of which indisputably there are several.

The objection that the court erred in overruling defendants' motion for a bill of particulars is not preserved for review. *People v. Ellsworth,* 261 Ill. 275. If it were it would be unavailing, and what was said in *People v. Smith,* 144 Ill. App. 129, is equally applicable here namely, that:

"All the substantial and material facts proved are shadowed forth with sufficient particularity in the various counts of the indictment, and evidence properly received in support of them. This is in accord with the settled law of this State on that subject. *Gallagher v. People,* 211 Ill. 158; *Kelly v. People,* 192 Ill. 119; *DuBois v. People,* 200 Ill. 157."

The matter of allowing a bill of particulars is within the sound discretion of the court and will not be cause for reversal unless it clearly appears that the defendant was damaged thereby, and we are unable to see from the record that defendants were in any way circumscribed in their defense by reason of not having a bill of particulars; furthermore, such record clearly shows that the charges in the indictment were familiar to them all.

We perceive no error in the court's ruling on the admission and exclusion of evidence. The conspiracy charged involved a boycott and obtaining money by threats of a boycott, and the manner in which it was carried out appears in the statement preceding this

opinion.  In all the cases the first step was the preparing of the "black list," in which all the defendants participated, as is proven by the secretary of the Painters' District Council, and is not seriously disputed. In most of the cases the second step was a demand for money.  A refusal was followed promptly by a smashing of plate glass windows in the building of the approached victim.  If by any chance the windows were replaced before financial settlement, they were again smashed and not until the victim had yielded to the extortion was he able to permanently replace such plate glass without further interference.  It is abundantly proven that all of the convicted defendants took part in and had knowledge of the preparation and circulation of this black list, which was sent twice weekly to the plate glass dealers, who, acting with the defendants and their co-conspirators, refused to furnish glass to the victims until their names were removed from such list at the direction of the conspirators. Every convicted defendant was proven to have received money from some one or more of the victims of the conspiracy.  They were all acting together at their headquarters, and much of the money extorted was paid to and received by most of them at Johnson's saloon.

The argument that there is no evidence proving that any of the defendants personally smashed any plate glass windows is, in light of the facts, of no consequence.  The sequence of events shows conclusively that such windows were broken as a part of the conspiracy to which all the defendants were parties, and from the statements made by several of the defendants that the money extorted was needed for other persons, it may reasonably be inferred that the glass breakers were such other persons.  While the pretense was made that the money extorted was for fines by certain unions, the evidence clearly demonstrates that such pretense was false.  No union is proven to have re-

ceived a dollar of these ill-gotten gains. Nor does it appear that any of the money extorted was in fact fines levied by any union organization, nor were there in existence any union by-laws which authorized the collection of the money extorted. In no event, however, and under no circumstances, could fines be assessed against any one not a member. The defendants applied the money extorted to their own personal use, and it is manifest that defendants were not, in their demands for any such money, engaged in enforcing union principles. In every instance where so-called "scab" work was the pretense for the exaction, after the money was paid no further question was raised regarding nonunion labor or work, and such work was allowed to remain without any change. The claim that money was paid to union workmen was a bald pretense, as no such workmen were at any time engaged in doing any work for the persons from whom the money was extorted or in or about their premises. Another suspicious circumstance is, that when checks were proffered they were refused and cash was demanded and nothing but cash accepted. Defendants preyed upon the community indiscriminately. In one instance they exacted money from a thrifty laborer and in another they attempted to extort money from a hodcarrier. The spirit of the humble hodcarrier is worthy of emulation. Evidently his inmost soul rebelled at the illegal extortion attempted, and he refused to yield to the extortioner. He dispensed with plate glass and installed a frame, setting therein small common glass, and strange as it may seem he was not thereafter molested.

In this case, the competent and unchallenged evidence in the record so conclusively fastens guilt upon each defendant convicted that, aside from errors in procedure, a court of review is not justified in reversing the judgment. As the Supreme Court said in *People v. Cleminson*, 250 Ill. 135, so we say:

''After much deliberation we have concluded that as we cannot say that upon the competent evidence there might be a doubt as to defendant's guilt, we would not be justified in reversing the judgment on account of the errors committed. *Wallace v. People,* 159 Ill. 446; *Jennings v. People,* 189 id. 320; *Barber v. People,* 203 id. 543; *Wistrand v. People,* 218 id. 323.''

In *People v. Halpin,* 276 Ill. 363, the court said:

''Error against the plaintiff in error occurred on the trial. Was it of such a character as to require a reversal of the judgment? The plaintiff in error was denied none of his constitutional or statutory rights. The errors were errors of procedure, in the admission of evidence and instructing the jury. If the correction of the errors might reasonably be expected to result in a different verdict this judgment should be reversed. On the other hand, if the jury, acting reasonably on the competent evidence, under proper instructions, could have reached no other conclusion than that of guilt the judgment ought not to be reversed so that a better record may be made on another trial.''

It was further said in *People v. O'Brien,* 277 Ill. 305, that:

''The record, as in the *Halpin* case, is not free from error, but it is free from any error that would justify a reversal of the judgment. The purpose of a criminal trial is to determine whether or not the defendant is guilty of the crime charged in the indictment. It is essential that the defendant shall be accorded all the rights he is entitled to under the law, and, if errors were committed denying him substantial rights, a reversal of the judgment of conviction would be required. It is not necessary, however, to sustain a conviction that the record should be free from all error, and where guilt is conclusively proven by competent evidence, and no other rational conclusion could be reached but that defendant is guilty, it would require more substantial errors than any shown by this record to justify a reversal of the judgment, and it is affirmed.''

So in this case is guilt conclusively proven by com-

petent evidence, and no other rational conclusion could be reached than that defendants are guilty as charged. Although there may be errors in this record, still, as they do not affect the constitutional or statutory rights of defendants, they cannot have the effect of justifying a reversal. The defendants before us are proven by the record, beyond all peradventure, to be guilty of the conspiracy charged against them in the indictment.

It was within the discretion of the court to excuse Juror Brown from service after he had been sworn to try the case, and it was not error to disallow the peremptory challenge of Juror Shaw. At common law jurors are sworn individually as accepted. Shaw had been sworn to try the case. Thereafter he was not subject to challenge except for cause, and no cause for excusing him was shown, nor pretense of a cause made. Moreover, it is the duty of the court to discharge a juror who has been sworn if it appears that from physical ailment he would be unable to sit through the trial. There is nothing in this record to show that defendants were prejudiced in any way or manner by the retention of Juror Shaw.

Several witnesses whose names were not upon the indictment were produced by the State and testified against the objection of defendants. It was discretiontary with the court to allow these witnesses to testify (*Simons v. People,* 150 Ill. 66), and it is not contended that defendants or any of them were taken by surprise by the calling of these witnesses. The discretion exercised in this regard is not reviewable. *Bolen v. People,* 184 Ill. 338. Furthermore, the court afforded defendants' counsel every opportunity to examine these witnesses and to confer with them and tendered them for that purpose. Counsel did not avail of this opportunity and cannot therefore now be heard to complain.

Grave complaint is made regarding remarks of counsel for the State in their closing arguments, to which

defendants excepted. A careful examination of the language objected to fails to disclose any reprehensible departure from the latitude allowed counsel by rules of law in argument. The remarks which bordered on the objectionable were incited by the arguments of counsel for defendants and were used in answering such arguments. At the conclusion of the evidence the State dismissed Lindloff and Geimer out of the case and one of the counsel criticised the State's Attorney for not sooner dismissing them. In answer to this Mr. Raber, representing the State, in his closing argument gave a reason for not dismissing the case earlier as to these defendants, saying, in substance, that he had waited until the case was closed in the expectation that these dismissed defendants would take the stand and he would have an opportunity to cross-examine them. This comment was permissible, but we think counsel went too far when he said, "Let me tell you that an honest man, when you make a charge against an honest man, a man whose record is clean, he invites investigation and puts himself there (indicating witness stand) and submits to any kind of a question, and why didn't Lindloff and Geimer do it?"

Mader and Crowley were the only remaining defendants who did not take the stand in their own defense, and it is said that such language was tantamount to telling the jury that if Mader and Crowley were "honest" men they would have taken the witness stand. Such an inference might have been indulged from such language, and were Mader and Crowley not proven to be flagrantly guilty as two of the leading and most active parties in the conspiracy, these remarks might be cause for reversal. They should not have been made, and far from approving we condemn them. If there was the slightest doubt about the guilt of these two defendants this criticism inferably directed against them might be regarded as cause for reversal. We think, however, in circumstances of this case that a

sufficient corrective was supplied in the court's instruction to the jury to disregard the remarks objected to and in giving, at the request of defendants, an instruction in appropriate language telling the jury not to consider such remarks; furthermore, in the selection of the jury each juror was frequently told by defendants' counsel that the law did not require any defendant to take the stand—that they could do so or not as they might choose. In a measure, the State's counsel were goaded into these dangerous paths by the arguments of defendants' counsel. For instance, one of the counsel for defendants persisted in his closing argument in commenting upon the unfairness of the State in keeping the defendants Geimer and Lindloff in the case until the proofs were closed, and he expatiated at some length upon the assumed virtues of these men. He roundly abused the State's representatives for their part in the prosecution of the case, and among other statements said: "There has not been a more unfair trial, I venture to assert, in the twenty-seven years of experience that I have had at this bar. There has not been anything quite like it." It was this character of argument which provoked the counsel for the State to say in closing the case some things which might well have been omitted, but we must admit that the provocation was great and we hold that the bounds permitted in such cases were not exceeded.

This same counsel in his argument to the jury assumed a virtue which illy became him in telling the jury that he was willing to go to the penitentiary and serve a year of his client's time. He knew that under no circumstances could he suffer part of the punishment meted out to his client. The comments of the State's counsel in answer to this boastful and insincere offer were permissible. Moreover, these remarks endangered the client's liberty, for from them the jury might reasonably infer that his counsel had

anticipated a conviction. We fail to discover any other remarks objected to which can be construed to have adversely affected any of the defendants.

More than sixty instructions were tendered the court, thirty-nine of which were given, seven tendered by the defendants being modified. A careful examination of all the instructions leads us to the conclusion that the jury were sufficiently and correctly instructed as to the law of the case and every phase thereof developed by the proofs—that no material legal principle applicable to the facts and the contentions of the parties was omitted from the instructions. The jury were sufficiently informed upon the law of the case and there was no error in the modification of instructions. Nor was the ruling of the court on defendants' refused instructions reversible error. Even if these refused instructions had been given regardless of their being right or wrong, the jury would not have been justified in returning any other verdict than that found in the record.

There are other matters argued as reasons for reversal which we have fully considered, but we do not find therein anything which in the slightest degree restricted the rights or privileges, under the law, of any of the convicted defendants who, after a long and patient hearing, were found guilty of the conspiracy charged in the indictment.

The record is free from reversible error and the judgments of the Criminal Court as to each and all of the defendants in this writ of error are affirmed.

*Affirmed.*